UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Diane Haner, on behalf of herself and all others similarly situated, | Court File No. |
| | Class Action |
| Plaintiff, | |
| | **Complaint** |
| v. | |
| Building Materials Corporation of America, d/b/a GAF Materials Corporation, | |
| Defendant. | |

---

Plaintiff Diane Haner, on behalf of herself and all others similarly situated, by and through her undersigned counsel, brings this Complaint in class action and alleges as follows:

### Summary of Class Action

1.      Plaintiff Diane Haner ("Plaintiff") owns a home in North St. Paul, Minnesota that has a roof shingled with Timberline Ultra shingles manufactured by defendant Building Materials Corporation of America, d/b/a GAF Materials Corporation ("GAF").

2.      GAF Timberline Ultra shingles are asphalt shingles that use a fiberglass material as their base.

3.      To be used on buildings and homes in the United States, shingles must be approved for use by state and local building codes. Without such approval, state and local codes prohibit shingles from being installed on homes and other structures.

4.      This case seeks redress for GAF's sale of shingles that failed to meet ASTM standards but were nonetheless listed and marked by GAF as being compliant with ASTM standards for fiberglass shingles.

5.      Because of raw material deficiencies and / or improper design and manufacturing, the GAF Timberline Ultra shingles on Plaintiff's home did not meet the performance requirements of ASTM D3462 at the time of sale and installation of those shingles at Plaintiff's home.

6.      These product defects cause GAF fiberglass shingles, like the Timberline Ultra Shingles used on Plaintiff's home, to prematurely crack and fail well before the end of their 40-year warranted life because the shingles uniformly fail the tear strength performance requirements of ASTM D3462 at the time of installation and have continued to degrade beyond what is anticipated or expected since the time of installation.

7.      GAF's management personnel have known for many years that defects in GAF's fiberglass shingles caused the shingles to prematurely crack and fail. GAF, however, concealed this and failed to inform homeowners, contractors, and consumers that it had been selling shingles that did not meet ASTM D3462 and that continue degradation beyond what is expected in the industry or by building owners.

8.      GAF has long known that its Timberline shingles have a "cracking problem" and assembled "cracking teams" to investigate the cause of the cracking. GAF ultimately concluded that defective raw materials had caused cracking, premature failure and non-compliance with ASTM D3462 in shingles made at several of its manufacturing facilities, including its facilities in Minneapolis, Baltimore, Millis and Fontana. GAF was also aware that shingles made at its Mobile, Alabama plant had a "cracking problem" and were failing at an unacceptable rate.

9.      GAF's shingles are plagued by design and manufacturing problems that result in cracking and other problems that make the shingles defective. These defects make it inevitable

2

that the shingles will degrade and fail before the end of their warranted or useful life and will cause property damage to the owners of buildings with such shingles.

10.    Finding that the raw materials that it had been using in Timberline shingles to be deficient, GAF changed its manufacturing specifications for newly manufactured shingles but did nothing to instruct or to warn consumers who had already purchased shingles with the inadequate raw materials.

## The Plaintiff

11.    Plaintiff Diane Haner is the owner of a home in North St. Paul, Minnesota that was re-shingled with GAF Timberline shingles.  At all relevant times, Plaintiff has been a resident and citizen of Minnesota.

12.    Plaintiff, on behalf of herself and all other persons and entities similarly situated, brings this action for and on behalf of the owners of homes and buildings with GAF Timberline shingles.  These shingles are defective, failed to comply with ASTM D3462 at the time of manufacture, sale, and installation, should never have been sold, and need to be removed or otherwise prematurely replaced from all structures.

## The Defendant

13.    GAF is in the business, among other things, of designing, advertising, warranting, manufacturing, distributing, and selling roofing products.  Among the products GAF manufactures, markets and sells are shingles used on homes and other buildings.

14.    GAF is a Delaware corporation that maintains its principal place of business and corporate headquarters in Wayne, New Jersey.

15.    GAF's marketing, sales, advertising, and warranty operations for Timberline shingles are located in New Jersey.

16.     GAF operates numerous shingle manufacturing facilities across the United States, including a facility located in or near Minneapolis, Minnesota.  GAF's multiple facilities across the United States resulted in nationwide manufacturing and distribution of Timberline shingles.

17.     GAF claims to be North America's largest manufacturer of roofing products like fiberglass shingles.  It claims in various advertisements and on its web site that GAF Timberline shingles are the "#1 selling shingle" in North America.

## Jurisdiction and Venue

18.     This Court has jurisdiction over the parties, the putative class, and the causes of action asserted herein pursuant to Rule 23 of the Federal Rules of Civil Procedure and under the Class Action Fairness Act, 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million.

19.     Venue in this forum is proper because Plaintiff resides in Minnesota, some of the putative class members reside in Minnesota, the causes of action for Plaintiff arose, in part, in Minnesota, and the causes of action for putative class members arose, in part, in Minnesota.

20.     GAF conducts business within Minnesota, delivers product to Minnesota, purposefully directs sales and marketing efforts to Minnesota and its residents, and maintains business facilities in Minnesota.

## Factual Background

**ASTM D3462**

21.     Purchasers and users of shingles require that manufacturers of shingles certify that the shingles comply with standards promulgated by relevant certification and standards organizations.

4

22.     ASTM International ("ASTM") is a standard setting organization that establishes and maintains industry standards for many different products. ASTM is an acronym that stands for "The American Society for Testing and Materials."

23.     ASTM establishes engineering and product testing standards. Shingles are among the products for which ASTM has developed standards and product testing programs. ASTM D3462 – Standard Specification for Asphalt Shingles Made from Glass Felt and Surfaced with Mineral Granules -- is recognized by the roofing industry as the critical standard for fiberglass-reinforced asphalt shingles.

24.     Model building codes in the United States reference ASTM D3462 as the minimum requirement for product performance for fiberglass-reinforced asphalt shingles. As a result, shingles that do not comply with ASTM D3462 cannot be legally installed on homes and buildings in the United States.

25.     One requirement of ASTM D3462 is that the fiberglass shingles pass certain tear strength tests that measure the shingles' ability to withstand tearing and cracking.

26.     If manufacturers of fiberglass shingles do not warrant their compliance with the applicable standards – including ASTM 3462 – consumers or the consumers' agents would not purchase those shingles and would instead purchase competitor shingles that did in fact meet the applicable standards.

27.     Fiberglass shingles that do not meet ASTM D3462 do not meet industry standards, are not marketable, have no market value, and could not be sold to consumers at any price.

**Prior Cracking Problems and Class Action Settlement for GAF Timberline Shingles**

28.     Because of problems with cracking in its shingles, GAF was previously named as a defendant in lawsuits. Included in those suits was a putative class action titled *Coleman, et al. v. GAF Building Materials Corporation*, CV-96-0954 (Alabama Circuit Court, Mobile County).

29.     GAF ultimately settled the *Coleman* lawsuit by paying more than $13 million to resolve claims involving cracking shingles. Only shingles manufactured before December 31, 1997 were included in that class action settlement.

30.     Plaintiff's GAF Timberline shingles were manufactured after December 31, 1997 and were therefore not included in the *Coleman* class action settlement.

**Cracking Studies and Their Concealment From Consumers**

31.     By the late 1990s, GAF had received reports of problems with cracking in its fiberglass shingles, including the Timberline Ultra shingles used on Plaintiff's home. GAF conducted a number of internal analyses of the cracking problems and issued reports. For example, GAF concluded that cracking claims for GAF laminated fiberglass shingles increased 43% from 2001 to 2002 alone.

32.     By 2002, GAF had spent several million dollars responding to claims brought by consumers for cracking shingles. The GAF Senior Vice President of Operations for all GAF manufacturing plants at that time, Ken Walton, directed GAF employees to further investigate the cracking problems.

33.     By 2003, the cracking of shingles manufactured in GAF's Minneapolis facility was the "fastest growing problem" facing GAF. In response to this problem, GAF created a team of personnel to study and investigate why its shingles were cracking well before the end of their warranted or useful life.

**Internal GAF Testing Proves its Shingles Will Crack and Fail Prematurely**

34.     GAF's former Director of Central Quality Assurance, Guy Gimbson, has admitted in sworn testimony that he was asked by his supervisor, Ken Walton, to produce a Central Quality Assurance ("CQA") report relating to cracking problems being reported with GAF shingles.

35.     By the time Ken Walton had requested this CQA report on shingle cracking, GAF had already concluded that the shingle cracking problem spanned across manufacturing facilities and geographic locations.

36.     In response to the growing shingle cracking problems, GAF and its employees, led by Guy Gimbson, held a number of technical meetings to investigate and analyze these problems.

37.     In 2002-2003, Guy Gimbson issued a CQA report that outlined the findings of the study and the cracking team efforts.

38.     Among the problems GAF identified were "cold weather cracking" failures of shingles manufactured by its Minneapolis facility.

39.     In August 2003, Guy Gimbson authored a CQA report titled "Minneapolis Shingle Cracking" and outlined testing done by GAF that proved that its laminated fiberglass shingles, including its Timberline shingles, cracked at low temperatures.

40.     At about the same time, the GAF quality assurance personnel also identified cracking problems in shingles manufactured in its Mobile, Alabama and Dallas, Texas facilities. Internal GAF documents describe the laminate shingles as having a "high failure rate" in all territories and climates in which they were sold.

41. In other internal documents including documents titled "Problem Analysis," the "State the Problem" section of the internal GAF document stated: "Shingles made in Minneapolis are cracking during warranty preview." The time frame given in that document for the problem being analyzed was "Product manufactured since the 1980s."

42. Internal GAF documents also analyze shingle cracking and failure problems related to shingles manufactured in its facilities in Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

43. GAF also investigated cracking problems reported in North Carolina related to shingles manufactured in its Mobile, Alabama facility and even assembled a "Mobile cracking team" to assess the problem.

44. Ultimately, GAF determined the cause of the cracking problems in the Minneapolis, Baltimore, Millis and Fontana facilities. GAF corporate representatives, including Guy Gimbson and Ken Walton, knew about the findings and conclusions of these studies.

45. GAF determined that defects or deficiencies in the raw materials used in Timberline and other laminate fiberglass shingles caused those shingles to prematurely crack and fail.

46. In response to its internal investigation, analysis, and conclusion that improper raw materials had caused the cracking failures, GAF changed its raw materials specifications for its Timberline fiberglass shingles.

47. Even after concluding internally that it had been manufacturing shingles with defective raw materials, GAF concealed – from consumers, contractors, and state and local code officials -- the fact that it had manufactured Timberline shingles that failed to comply with ASTM D3462 and were cracking when used as intended.

48.     Although it changed its own materials specifications because it knew that its old specifications produced shingles that could not meet ASTM D3462 requirements and cracked when used as intended, GAF concealed from contractors, distributors, regulatory authorities, and consumers that it had long been selling shingles that were of inferior quality, could not meet ASTM D3462's performance requirements, and would crack or otherwise be damaged and fail when used as intended.

49.     Instead of acting honestly and responsibly to minimize harm to it customers and consumers, GAF chose to continue its scheme to conceal these defects and simply changed its internal raw materials specifications without advising consumers of the problems associated with Timberline shingles.

50.     GAF employees involved in this scheme included, but were not limited to, Guy Gimbson, Walt Workman, and Ken Walton.

51.     The failure to comply with ASTM D3462 requires that all homes or properties with GAF Timberline shingles manufactured after December 31, 1997 be re-roofed with shingles that comply with ASTM D3462.

**False Advertising and Misbranding of GAF Timberline Shingles**

52.     GAF markets and advertises its Timberline shingles as being "the heaviest and longest-lasting fiberglass asphalt shingle in the Timberline series" and that their design "promotes longest life and extra durability." (www.gaf.com; 4/27/99).

53.     GAF markets and advertises Timberline shingles as possessing "superior strength and improved weathering in harsh conditions" because of its "Micro Weave Core" fiberglass felt. (www.gaf.com; 4/27/99).

9

54.     GAF also markets, advertises, and states on its Timberline packaging that the shingles meet ASTM D3462.

55.     Compliance with ASTM D3462 is a material requirement and term for the purchase of fiberglass shingles.

56.     In virtually every piece of marketing materials associated with GAF Timberline shingles, GAF falsely claimed that the shingles complied with ASTM D3462. For the reasons stated herein, these statements were false and misleading because the shingles actually produced and sold to consumers did not meet ASTM D3462 requirements.

57.     GAF made these false statements every time it sold GAF Timberline shingles in packages that were all stamped with ASTMD3462, which falsely claimed that the shingles complied with that standard.

58.     Because the GAF Timberline shingles did not meet ASTM D3462, GAF falsely represented and advertised that those shingles complied with the standard.

59.     GAF's marketing and sales materials also falsely represented the true certifications and characteristics of the Timberline shingles. For example, in sales brochures titled GAF falsely claimed that the shingles met ASTM D3462.

60.     In marketing and sales brochures, GAF shingles are falsely represented as meeting ASTM D3462 requirements and were high quality shingles that would last for decades without problems.

61.     GAF continued to publicly disseminate these brochures, which contain the false and misleading information described herein, until just recently. Similar brochures continue to be listed at GAF's web site, www.gaf.com.

62.     GAF also falsely claimed on its web site that: "Because of our state-of-the-art manufacturing process, the odds of you having a problem with a new GAF roof is about one in a thousand." This statement was false and actually contradicted by the GAF testing referenced in this Complaint.

63.     Each of the false statements and misrepresentations made in the preceding paragraphs were repeatedly restated by GAF's sales personnel and their manufacturer's representatives, in the course of every sale of GAF shingles. GAF, however, knew at the time these statements were provided to consumers, suppliers, and contractors that the statements were false and unsupported.

64.     At all times and in all communications with consumers, suppliers and contractors, GAF and its representatives knowingly misrepresented that GAF Timberline shingles were fit and suitable for use in new home construction, remodels and repairs when in fact the shingles did not meet ASTM D3462 and therefore did not meet applicable building code requirements.

65.     At all times and in all communications with consumers, suppliers and contractors, GAF and its representatives knowingly misled consumers into believing that GAF shingles complied with ASTM D3462 and were therefore legal to use on roofing projects.

66.     Whether the shingles complied with ASTM D3462 was a material fact for the consumers and purchasers of GAF Timberline shingles. GAF through misrepresentations, knowing omissions, and other sharp business practices– misled consumers and otherwise concealed the true nature of the shingles with the intent that consumers and purchasers rely on those representations and omissions.

67.    In addition to the representations made in their advertising materials and on their web sites, the Timberline shingles packaging sold by GAF had stamps on them which indicated that the shingles conformed to ASTM D3462. When a product or packaging is marked with the ASTM designation D3462, the product is represented to have been manufactured, tested, inspected and sampled in accordance with that standard and has been found to meet the standard's requirements.

68.    When GAF and its representatives made each of the affirmative misrepresentations outlined herein, GAF knew or should have known that the representations were false and / or misleading. When marking its shingles packaging with an ASTM D3462 designation, GAF and its representatives intended that consumers, purchasers of these shingles, roofing contractors, and code officials would rely on the false and misleading statements. Plaintiff and her representatives as well as local officials received and relied on such representations.

69.    GAF's shingles, however, did not comply with ASTM D3462's tear strength requirements and therefore could not comply with ASTM D3462. GAF knew or should have known that its advertising statements about compliance with ASTM D3462 were false. GAF knew or should have known that its certification of compliance with ASTM D3462 by stamping that designations on every shingle package were false.

70.    GAF was obligated to disclose the defects, use of substandard materials, and non-compliance with industry standards because such disclosure was necessary to qualify affirmative representations made about GAF Timberline shingles and to make such representations non-misleading. The failure to inform consumers about these problems rendered GAF's affirmative representation about the shingles materially misleading. Such disclosure was also necessary

because GAF was uniquely in possession of facts it did not disclose, knew that such facts were not available to Plaintiff and the putative class members, and knew that such facts that had been knowingly omitted would be material to any prospective purchase of the Timberline shingles.

71.    At all times and in all communications with consumers, suppliers and contractors, GAF and its representatives knowingly misled consumers into believing that Timberline shingles complied with ASTM standards. Plaintiff, her representatives and other consumers relied on these misrepresentations because the shingles could not have been used in the United States without compliance with those standards. GAF, therefore, passed off its shingles as being of a particular quality, standard or grade that they were in fact not.

72.    Plaintiff, her representatives and other consumers believed, based on GAF's representations, that she was purchasing shingles that complied with ASTM D3462 and that complied with state and local building codes. Plaintiff, her representatives and other consumers would not have purchased GAF shingles or properties that used those shingles if they had known the truth about the shingles.

73.    Plaintiff, her representatives and other consumers believed, based on GAF's representations, that GAF used proper materials for Timberline shingles and would not have bought the shingles if GAF had disclosed the truth about its "cracking problems," "cracking teams," or the fact that it had concluded that there was materials problem with these shingles. No reasonable consumer or contractor would have bought these shingles if GAF had not concealed this important information.

**Plaintiff's Circumstances**

74.    Plaintiff owns a home in North St. Paul, Minnesota that has a roof shingled with GAF Timberline shingles.

75.     The packaging of the shingles delivered to and used on Plaintiff's home are stamped with an ASTM D3462 designation, implying that the shingles complied with ASTM D3462.

76.     The GAF shingles on Plaintiff's home were installed by a contractor that had been trained and certified by GAF to install its Timberline shingles.

77.     The roofing contractor and city and local officials reasonably believed that the GAF Timberline shingles used on Plaintiff's home met all listing and code requirements and expressly relied on the ASTM D3462 designations placed on the shingle packaging by GAF.

78.     Plaintiff and the installing contractor, when purchasing GAF Timberline shingles, reasonably expected that the shingles complied with all listing and code requirements and Plaintiff and her representatives relied on the accuracy of the designations affixed to the shingles and their packaging.

79.     Before purchasing and deciding to install GAF Timberline shingles at Plaintiff's home, Plaintiff was told that GAF provided a 40-year warranty for the shingles and that Plaintiff would pay a premium for a 40-year shingle as compared to shingles with a shorter warranted life.

80.     Plaintiff and the installing contractor reasonably relied on GAF's representations about compliance with ASTM standards and code compliance when deciding to purchase the GAF shingles with the express warranty and that a 40-year shingle would be robust enough to provide roofing protection for that length of time.

81.     Because of GAF's conduct outlined herein, Plaintiff and members of the putative class did not know, and could not have known, that their shingles did not comply with ASTM D3462 and local code requirements at the time of sale and installation.  Moreover, GAF's

conduct has prevented class members from discovering that their shingles are defective and that remediation was necessary to rectify the non-compliance and its concomitant risks and problems.

82.    Because of GAF's conduct outlined herein, Plaintiff and members of the putative class did not know, and could not have known, that their shingles were made from substandard and defective materials, had a "cracking problem," and were the subject of "cracking teams" investigations at the time of sale and installation. Moreover, GAF's conduct has prevented class members from discovering that their shingles are defective and that remediation was necessary to rectify the non-compliance and its concomitant risks and problems.

83.    GAF's conduct outlined herein was intended to and did in fact fraudulently conceal its conduct and, as a result, tolled the statute of limitations for Plaintiff and members of the putative class.

84.    Because GAF concealed the fact that its shingles were made from inappropriate materials, did not comply with ASTM D3462, had a cracking problem, and in fact affirmatively alleged that the shingles complied with ASTM D3462, Plaintiff did not, and could not have discovered the defects in the shingles because no reasonable consumer would have the ability to independently discover these facts.

85.    The cracking process of these shingles is present and underway even before the problems are noticed by a consumer or contractor.

86.    Plaintiff did not discover that her GAF shingles were cracked and cracking until 2010 when a family member noticed the cracked shingles. Until the cracking of the shingles was visible and noticeable to a consumer, Plaintiff had no reason to suspect that GAF had sold defective and misbranded shingles.

87.     Shortly after discovery, Plaintiff contacted GAF, which continued to conceal the true nature of the defect in the shingles used on Plaintiff's home. However, after contacting GAF about the problem, Plaintiff began to inquire about the cause of the cracking. At no time during this process did GAF advise Plaintiff about the cracking problems, "cracking teams," or substandard materials used in GAF Timberline shingles.

88.     In the course of attempting to address her complaints about the GAF Timberline shingles, GAF tried to force Plaintiff to accept terms that were not required by the 40-year express warranty GAF claimed to apply to these shingles. In addition, GAF attempted to impose unenforceable limitations on the scope of the warranty coverage and its obligation to Plaintiff.

89.     For example, GAF attempted to force Plaintiff to swear, under the penalty of perjury, that "any compensation will be applied to the repair or replacement of the GAF, Elk or GAF-Elk shingles described herein, and if such compensation is not so applied, the Undersigned agree(s) to notify any subsequent purchaser of your building . . . that this Claim has been made; or to record this Claim in the appropriate public title records concerning the property of your building."

90.     GAF had no legal right to demand or condition its payment of express warranty obligations on Plaintiff or any other consumer's acquiescence to the demands set out in the preceding paragraph.

91.     GAF also attempted to force Plaintiff to swear, under the penalty of perjury, that "The Undersigned also agree(s) that if the foregoing disclosures are not made in the manner required above, the Undersigned will indemnify GAF-Elk Corporation for the amount of any compensation made to a subsequent purchaser of your building for the same dammar or repair expenses claimed herein."

16

92.    GAF had no legal right to demand or condition its payment of express warranty obligations on Plaintiff or any other consumer's acquiescence to the demands set out in the preceding paragraph.

93.    GAF made the unsupported and unlawful demands described in the preceding paragraphs in preprinted and uniform "Claim Form for Shingle Damage" forms GAF used to process warranty claims for all of its shingles.

94.    Upon information and belief, GAF has uniformly demanded that consumers acquiesce to the unsupported and unlawful demands in the Claim Form for Shingle Damage as described herein.

95.    After reviewing Plaintiff's claim and the cracked shingles she provided as part of the claims process, GAF accepted Plaintiff's claim and therefore conceded that Plaintiff's shingles had manufacturing defects.

96.    GAF, however, attempted to limit its payment to Plaintiff in ways that are not enforceable under the applicable law and attempted to enforce pretend warranty limitations or disclaimers that were unconscionable and / or unenforceable.  In doing so, GAF has breached any express warranties applicable to these shingles.

97.    Plaintiff contacted legal counsel for advice about the cracking shingles. Plaintiff's legal counsel retained an expert in the analysis of roofing materials who conducted testing on shingles that had cracked on Plaintiff's roof and new GAF shingles taken from the squares used on Plaintiff's home but which had never been installed.

98.    In 2011, the testing done on the shingles taken from Plaintiff's home, including new and unused shingles, showed that the GAF shingles failed to meet the tear strength testing requirements of ASTM D3462.  Plaintiff learned about the results of this testing in February

2011 and, for the first time, learned that the shingles GAF sold to her did not comply with the applicable standards.

99.    Plaintiff, like all class members, has a real and present injury in that she owns a home with substandard shingles that do not comply with ASTM D3462. The damage includes the cost to replace the shingles to become code compliant and to avoid further damage to other parts of the structure caused by the defective and cracking shingles. Likewise, Plaintiff and putative class members have incurred or are reasonably certain to incur, the cost of repairing the damage to their other property that was caused by GAF's sale of defective shingles.

100.    Plaintiff and the proposed class members suffered damage to property other than the GAF shingles, general and specific compensatory and contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

## Proposed Class Definitions

101.    Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The first proposed class is defined as:

> All persons and entities that own or owned a structure in the United States that contains or contained Timberline shingles manufactured from December 31, 1997 to the present in GAF Material Corporation's facilities in Minneapolis, Minnesota; Mobile, Alabama; Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

102.    Alternatively, Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for a second proposed class or subclass defined as:

> All persons and entities that own or owned a structure, within certain of the
> United States, that contains or contained Timberline shingles manufactured from
> December 31, 1997 to the present in GAF Material Corporation's facilities in
> Minneapolis, Minnesota; Mobile, Alabama; Baltimore, Maryland; Millis,
> Massachusetts; and Fontana, California.

103. Alternatively, Plaintiff brings this class action on behalf of herself and all others

similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil

Procedure, for a third proposed class or subclass defined as:

> All persons and entities that own or owned a structure, within Minnesota, that
> contains or contained Timberline shingles manufactured from December 31, 1997
> to the present in GAF Material Corporation's facilities in Minneapolis,
> Minnesota; Mobile, Alabama; Baltimore, Maryland; Millis, Massachusetts; and
> Fontana, California.

104. Plaintiff specifically excludes GAF and its related entities from the putative class,

all subsidiaries or affiliates of GAF; any entity in which GAF has a controlling interest; and any

and all of GAF's employees, affiliates, legal representatives, heirs, successors or assignees.

105. Plaintiff also excludes from the putative class any person or entity that has

previously commenced and concluded a lawsuit against GAF arising out of the subject matter of

this lawsuit.

106. Plaintiff also specifically excludes from the putative class the judge assigned to

this case and any member of the judge's immediate family.

107. Plaintiff and her counsel reserve the right to modify or amend the class

definitions, as appropriate as this case proceeds.

## **Satisfaction of Class Prerequisites**

108. This class action satisfies numerosity, commonality, typicality, adequacy and

superiority requirements for maintaining a class.

109.     Certification of Plaintiff's claims for class wide treatment is appropriate because Plaintiff can prove the elements of her claims using common, class-wide evidence. Such evidence includes GAF's own internal documents which confirmed that it had used substandard materials, which it subsequently abandoned.

110.     **Numerosity.** Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the putative class "is so numerous that joinder of all members is impracticable." The number of members of the putative class is believed to be at least tens of thousands of individuals and/or entities that own properties with GAF Timberline and other fiberglass shingles.

111.     Joinder of the persons and entities whose properties use GAF Timberline and other fiberglass shingles is impractical and not feasible.

112.     **Commonality.** Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the putative class shares "questions of law or fact" that predominate and individualized issues. The common questions include, but are not limited to, the following:

- Were GAF's shingles defectively designed for their intended application, and if so, what is the nature of the design defect?

- Were GAF's shingles defectively manufactured for their intended application, and if so, what is the nature of the manufacturing defect?

- Did GAF fail to instruct or to warn consumers its shingles failed to meet ASTM D3462 requirements at the time of sale and installation?

- Did GAF adequately instruct or warn consumers about the cracking propensities of its shingles?

- Did GAF make fraudulent, false, deceptive and/or misleading statements in connection with the sale of its shingles in its packaging and product literature?

- Did GAF omit material information when it sold its fiberglass shingles?

- Did GAF utilize misrepresentations, knowing omissions, or other sharp business practices when it advertised, marketed, and sold its fiberglass shingles?

- Did GAF exercise reasonable care in the design, manufacture and testing of its fiberglass shingles?

- Did GAF deliberately sell or allow fiberglass shingles to be distributed after it knew the shingles could not meet ASTM D3462?

- What categories of damages are recoverable for owners of structures with GAF fiberglass shingles, e.g., replacement, consequential, incidental or other damages?

- Is Plaintiff entitled to relief under GAF's express warranties?

- Is GAF able to condition express warranty payments on consumers' acquiescence to demands by GAF that are not contained in any express warranty?

- Is GAF obligated to provide a post-sale warning or instruction to the owners of buildings that use its fiberglass shingles?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

113.    **Typicality.** Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the putative class representative "are typical of the claims … of the class." Plaintiff and all members of the putative class who own GAF's defective shingles have suffered damages as a result of GAF's wrongful acts and misconduct. Pursuant to corporate directives, GAF engaged in a similar pattern of misconduct towards both the Plaintiff and all the other putative class members.

114.    **Adequacy.** Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, the putative class representative "will fairly and adequately protect the interests of the class." Plaintiff has no adverse interests to the putative class members. Plaintiff was sold or installed defective and mislabeled GAF shingles. Plaintiff has retained lawyers who have substantial resources, experience and success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

115.    **Superiority.** Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons:

a.   A class action in this instance conserves the resources of the putative class, GAF and the Court. The damages of most putative class members are not, in isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for Plaintiff and most putative class members, makes it difficult if not impossible for the class members to seek redress. The costs of retaining an expert to issue a report, be deposed, and to appear and testify at trial is substantially more costly than the value of the average claim is worth absent a fess shifting statute.

b.   On information and belief, no Attorney General of any state has brought an enforcement action against GAF to remedy the claims asserted herein.

c.   There are and likely will be other cases pending against GAF. Serial adjudications in numerous venues are not efficient, timely, or proper. Judicial resources throughout Minnesota and the United States will be unnecessarily depleted by resolution of individual claims.

d.   Individualized judgments and rulings could result in inconsistent relief for similarly situated plaintiffs. Individualized lawsuits could also establish incompatible standards of conduct for GAF in creating, marketing, sale and post-sale conduct in connection with its fiberglass shingles.

## Count I

### (Breach of Express Warranties)

116.   Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

117.   GAF made certain express warranties to distributors, contractors, and consumers about the shingles it would provide.

118.   The express warranties provided by GAF included warranties that GAF Timberline shingles were fit and suitable for use on homes and other structures, would be non-defective and merchantable, and complied with ASTM D3462. Such warranties were made in the product literature described in this Complaint and on the packaging of the shingles.

119.     Compliance of these shingles with ASTM D3462 was a separate and distinct warranty that was material and uniformly relied upon by all members of the putative class and their representatives.

120.     The express warranties provided by GAF also included warranties that GAF Timberline shingles were warranted and would perform adequately for 40 years.  GAF used the same or substantially the same warranty terms for all Timberline shingles sold during the time at issue in this case.

121.     Shingle distributors, contractors, code and local officials, Plaintiff and the putative class members relied upon GAF's express warranties.

122.     GAF breached its express warranties by manufacturing and selling shingles that were defective, did not meet ASTM D3462 requirements, and were not suitable for use on homes and other structures in the United States.

123.     GAF also breached its express warranties by refusing to pay the full amount owed to Plaintiff and other members of the putative class and by attempting to condition payment under those warranties on demands made by GAF that were not part of those warranties.

124.     GAF also breached its express warranties by refusing to pay the full amount owed to Plaintiff and other members of the putative class and by attempting to limit its obligation under express warranties by attempting to enforce unenforceable or unconscionable disclaimers or limitations.

125.     As a direct, proximate and foreseeable cause of GAF's breach of express warranties, Plaintiff and the putative class members sustained damages in an amount to be determined at trial.

## Count II

### (Negligence)

126. Plaintiff and the putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

127. GAF was negligent in that it failed to use reasonable care when it designed, tested, manufactured, marketed and sold Timberline shingles.

128. As the designer, tester, manufacturer, and / or seller of consumer products, GAF owed a duty to Plaintiff and the putative class members to provide a safe and quality product, and a duty to provide a product that was properly certified and labeled for use on homes and other structures. GAF breached those duties.

129. As a direct and proximate result of GAF's negligence, lack of care, and other wrongful acts, Plaintiff and the putative class members sustained and will sustain damages.

130. As a result of GAF's negligence, Plaintiff and the putative class have suffered actual damages in that they have purchased and installed in their homes and structures, shingles that are defective, unreasonably dangerous and unsuitable for their intended use.

131. The degradation and failure of GAF's shingles causes damage to property other than the shingles themselves in use and during the removal and reinstallation process.

132. As a result of GAF's negligence, Plaintiff and the putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles, consequential, and incidental damages.

133. As a direct, proximate and foreseeable result of GAF's negligence, Plaintiff and the putative class members have been damaged in an amount to be determined at trial.

## Count III

### (Negligent Failure to Instruct or to Warn)

134.    Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

135.    As the designer, tester, manufacturer, and seller of a consumer product, GAF had a duty to provide accurate labeling and written materials for its products.

136.    As the designer, tester, manufacturer, and seller of a consumer product, GAF had a duty to instruct or to warn of foreseeable dangers inherent in the proper use of its products and to properly label and package its products.

137.    GAF was aware that its Timberline shingles had a propensity to crack and did not comply with ASTM D3462 at the time of sale and installation and, as a result, should not and could not be used for their intended purpose.

138.    Despite the fact that GAF knew its Timberline shingles were defective and should not be used, GAF continued to sell the products to the public without correction and, in fact, concealed from the public the fact that the shingles were defective, mislabeled, and not suitable for their intended use.

139.    Because the shingles related to the habitability of persons' homes, GAF had a duty to consumers and to the public to disclose the defective nature of their shingles and not to conceal and suppress the defective nature of the product from Plaintiff and the putative class members.

140.    GAF, however, engaged in a scheme to cover up the true nature of the problems. This scheme included the concealment of GAF's "cracking teams" and its internal acknowledgement that it had been using inadequate materials for Timberline shingles. This

scheme also included GAF's attempts to keep information about the defective nature of the shingles out of the public domain by failing to inform consumers, contractors, and code officials that its Timberline shingles did not meet ASTM standards.

141.    To this day, GAF continues this concealment and suppression by failing to inform the public about the unsuitability of the shingles for their intended use and their non-compliance with ASTM standards.  As the manufacturer, seller and distributor of consumer products, GAF had a duty to provide such information.

142.    As a direct, proximate and foreseeable result of GAF's failure to instruct or to warn, Plaintiff and the proposed members of the class suffered damage.

143.    As a result of GAF's failure to instruct or to warn, Plaintiff and the putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, unreasonably dangerous and unsuitable for their intended use.

144.    As a result of GAF's failure to instruct or to warn, Plaintiff and the putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles, consequential, and incidental damages.

145.    As a direct, proximate and foreseeable result of GAF's negligence, Plaintiff and the putative class members have been damaged in an amount to be determined at trial.

**Count IV**

**(New Jersey Consumer Fraud Act)**

146.    Plaintiff and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

147.    The New Jersey Consumer Fraud Act, N.J.S.A § 56:8-1 *et seq.,* states:

26

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

148.    Plaintiff and GAF are each a "person" as defined by N.J.S.A § 56:8-1(d).

149.    By engaging in the conduct described herein, GAF violated N.J.S.A § 56:8-2 by

falsely and deceptively labeling and advertising its fiberglass shingles as being safe and

approved for use and complying with ASTM D3462 and by concealing, suppressing, or omitting

material facts about the substandard quality and defects in the shingles.

150.    GAF violated N.J.S.A § 56:8-2, as more fully described herein, by its conduct

including its:

-Fraudulent, misleading, and deceptive statements and practices relating to the compliance of Timberline shingles with ASTM D3462;

-Fraud and misrepresentation by knowing omission of information about the defective nature of Timberline shingles, the improper design and manufacture of the products, and GAF's knowledge of those defects;

-Fraudulent, misleading, and deceptive statements and practices relating to the sale of shingles that did not meet the applicable standards or codes and used substandard materials in direct contradiction to GAF's sales and marketing of those shingles including the 40-year warranted life of the shingles for which Plaintiff and the class members paid a premium over shingles with a shorter warranted life; and

-Concealment of the true nature of its defective shingles.

151.    When making the intentional misrepresentations and engaging in the

concealment, suppression, and omission of material facts set out in this Complaint, GAF

intended that Plaintiff, her representatives, roofing distributors and contractors, local authorities, and other consumers would rely upon the deceptive acts described in this Complaint.

152.   As a result of GAF's unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation and knowing concealment, suppression, or omission of material facts relating to the sale of GAF Timberline shingles, Plaintiff and members of the putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, not in compliance with code requirements, and that are of less value than what was warranted by GAF.

153.   As a result of GAF's unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation and knowing concealment, suppression, or omission of material facts relating to the sale of GAF Timberline shingles, Plaintiff and members of the putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles and consequential and incidental damages.

154.   Pursuant to N.J.S.A § 56:8-19, Plaintiff and the putative class will seek damages and remedies allowed by that section and will, because of the willful deceptive acts alleged in this Complaint, ask the Court to treble damages and award attorneys' fees and expenses.

## Count V

### (Consumer Fraud)

155.   Plaintiff and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

156.   Minnesota Statutes § 325F.69, subd. 1 makes it unlawful for any person by use of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive

28

practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby...."

157. By engaging in the conduct described herein, GAF violated Minn. Stat. § 325F.69, subd. 1.

158. By making the misrepresentations set out in this Complaint, which are hereby incorporated, GAF used false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others rely on those statements, in the course of the sale of GAF Timberline shingles.

159. GAF's wrongful conduct and use of false pretenses, false promises, misrepresentations, and misleading statements, all with the intent that others relied on those statements, also includes, by way of example and not by limitation:

    a.     GAF's fraudulent, misleading, and deceptive statements and practices relating to the compliance of Timberline shingles with ASTM D3462;

    b.     GAF's fraud and misrepresentation by omission, of information about the defective nature of Timberline shingles, the improper manufacture of the products, and GAF's knowledge of those defects,

    c.     GAF's fraudulent, misleading, and deceptive statements and practices relating to the sale of shingles that would prematurely crack when used as intended while GAF advertised and represented that the shingles were suitable for their intended use, and

    d.     GAF's concealment of the true nature of its defective shingles

160. Plaintiff and her representatives, and the class members and their representatives, received the misrepresentations and omissions described herein when deciding to purchase GAF Timberline shingles.

161. As a result of GAF's fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practice practices relating to the sale of Timberline

shingles, the Plaintiff and putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, not suitable for their intended use, and not in compliance with ASTM D3462 and there is a causal nexus between GAF's actions and the damages suffered by the Plaintiff and the Class.

162.    As a result of GAF's fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practices, the Plaintiff and putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, property damage, consequential and incidental damages.

163.    That as a direct, proximate and foreseeable result of GAF's violation of statute, the Plaintiff and putative class members sustained damages in an amount to be determined at trial.

## Count VI

### (Unlawful Trade Practices)

164.    Plaintiff and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

165.    Minnesota Statutes § 325D.13 provides that, "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

166.    By engaging in the conduct described herein, GAF violated Minn. Stat. § 325D.13.

167.    By making the misrepresentations set out in this Complaint, which are hereby incorporated, GAF knowingly misrepresented the true quality of its Timberline shingles with the intent that others would rely on those statements.

168. By making the omissions set out in this Complaint, which are hereby incorporated, GAF knowingly misrepresented the true quality of its GAF shingles with the intent that others would rely on those statements.

169. GAF's wrongful conduct and misrepresentation of the true quality of Timberline shingles, also includes, by way of example and not by limitation:

  a. GAF's fraudulently claiming that Timberline shingles complied with ASTM D3462;

  b. GAF's fraud and misrepresentation by omission, of information about the defective nature of Timberline shingles, the improper design of the products, and GAF's knowledge of those defects,

  c. GAF's fraudulent, misleading, and deceptive statements and practices relating to the sale of Timberline shingles that were made from defective and substandard materials while GAF advertised and represented that the shingles would last 40 or more years, and

  d. GAF's concealment of the true nature of its defective Timberline shingles

170. GAF and its agents and distributors also misrepresented the true quality of Timberline shingles by making the various statements about the alleged quality of the shingles as referenced throughout this Complaint.

171. Plaintiff, her representatives, and members of the public received and relied upon the misrepresentations and omissions made by GAF and described herein when deciding to purchase Timberline shingles or purchase a property with those shingles.

172. As a result of GAF's practices relating to misrepresentation of the true quality of Timberline shingles, Plaintiff and putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, not suitable for their intended use, and not in compliance with ASTM D3462 and there is a causal nexus between GAF's actions and the damages suffered by the Plaintiff and the Class.

173.    As a result of GAF's fraud, false pretense, false promises, misrepresentations, misleading statements and deceptive practices, the Plaintiff and putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, property damage, consequential and incidental damages.

174.    As a result of GAF's practices relating to misrepresentation of the true quality of Timberline shingles, Plaintiff and putative class are entitled to declaratory and injunctive relief informing them of the problems associated with the shingles, instructing them about the dangers posed by the shingles as a result of their non-conformance with ASTM standards, and their rights under the applicable laws and warranties. Further, GAF should be ordered to test the prematurely-failing shingles to determine whether the shingles, in fact, provide the fire ratings required by law and expected by consumers.

175.    There is a causal nexus between the GAF's actions and the injunctive and declaratory relief sought in this action.

## Count VII

### (Deceptive Trade Practices)

176.    Plaintiff and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

177.    Minnesota Statutes § 325D.44, subd. 1 provides in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
>
>> (5)    Represents that goods or services have...characteristics, ingredients, uses, benefits...that they do not have...
>>
>> (7)    Represents that goods or services are of a particular standard, quality, or grade,...if they are of another.

> (13)   Engages in any other conduct which
> similarly creates a likelihood of confusion or of
> misunderstanding.

178.   By engaging in the conduct described herein, GAF violated Minn. Stat. §

325D.44.

179.   By making the misrepresentations set out in this Complaint, which are hereby

incorporated, GAF knowingly misrepresented the true characteristics, standards, quality, and

grade of its Timberline shingles with the intent that others would rely on those statements.

180.   By making the omissions set out in this Complaint, which are hereby

incorporated, GAF knowingly misrepresented the true characteristics, standards, quality, and

grade of Timberline shingles with the intent that others would rely on those statements.

181.   GAF's wrongful conduct and misrepresentation of the true characteristics,
standards, quality, and grade of Timberline shingles, also includes, by way of example and not
by limitation:

   a.   GAF's fraudulently claiming that Timberline shingles complied with ASTM
        D3462;

   b.   GAF's fraud and misrepresentation by omission, of information about the
        defective nature of Timberline shingles, the improper design of the products, and
        GAF's knowledge of those defects,

   c.   GAF's fraudulent, misleading, and deceptive statements and practices relating to
        the sale of Timberline shingles that were made from defective and substandard
        materials while GAF advertised and represented that the shingles would last 40 or
        more years, and

   d.   GAF's concealment of the true nature of its defective Timberline shingles

182.   GAF and its agents and distributors also misrepresented the true characteristics,

standards, quality, and grade of Timberline shingles by making the various statements about the

alleged quality of those shingles as referenced throughout this Complaint.

183.    There is a causal association between GAF's actions and Plaintiff's and her

representatives', and members of the public's decision to purchase Timberline shingles or

purchase a property with those shingles.

184.    Plaintiff seeks declaratory and injunctive relief informing owners of these

shingles of the problems associated with the shingles, instructing them about the dangers posed

by the shingles and their rights under the applicable laws and warranties. Further, GAF should

be ordered to test the prematurely-failing shingles to determine whether the shingles, in fact,

provide the fire ratings required by law and expected by consumers.

## Count VIII

### (False Advertising)

185.    Plaintiff and proposed class members reallege the foregoing paragraphs,

inclusive, as though fully set forth herein.

186.    That Minnesota Statutes § 325F.67 provides in part:

> Any person, firm, corporation, or association who, with intent to sell or in
> any way dispose of merchandise, …service, directly or indirectly, to the
> public, for sale or distribution, or with intent to increase the consumption
> thereof, or to induce the public in any manner to enter into any obligation
> relating thereto, makes, publishes, disseminates, circulates, or places
> before the public, or causes, directly or indirectly, to be made, published,
> disseminated, circulated, or places before the public, in this state, in a
> newspaper or other publication, or in the form of a book, notice, handbill,
> poster, bill, label, price tag, circular, pamphlet, program, or letter, or over
> any radio or television station, or in any other way, an advertisement of
> any sort regarding merchandise,…service or anything so offered to the
> public for use, consumption, purchase, or sale, which advertising contains
> any material assertion, representation or statement of fact which is untrue,
> deceptive, or misleading, shall, whether or not pecuniary or other specific
> damage to any other person occurs as a direct result thereof, be guilty of a
> misdemeanor, and any such act is declared to be a public nuisance and
> may be enjoined as such.

187.    That by engaging in the conduct described herein, GAF violated Minn. Stat. § 325F.67.

188.    By making the misrepresentations set out in this Complaint, which are hereby incorporated, GAF made untrue, deceptive, and misleading assertions and representations about Timberline shingles with the intent that others would rely on those statements.

189.    By making the omissions set out in this Complaint, which are hereby incorporated, GAF knowingly made untrue, deceptive, and misleading assertions and representations about Timberline shingles with the intent that others would rely on those statements.

190.    GAF's untrue, deceptive, and misleading assertions and representations about Timberline shingles, also include, by way of example and not by limitation:

      a.    GAF's untrue, deceptive and misleading claims relating to the compliance of Timberline shingles with ASTM D3462;

      b.    GAF's untrue, deceptive and misleading claims about the defective nature of Timberline shingles, the improper manufacture of the products, and GAF's knowledge of those defects;

      c.    GAF's untrue, deceptive and misleading claims relating to the sale of shingles made with defective and substandard materials while GAF advertised and represented that the shingles would last 40 years or more; and

      d.    GAF's concealment of the true nature of its defective shingles

191.    GAF and its agents and distributors also made untrue, deceptive, and misleading assertions about Timberline shingles by making the various statements about the alleged quality and certification of the shingles as referenced throughout this Complaint.

192.     There is a causal association between Plaintiff's, her representatives', and members of the public's decision to purchase Timberline shingles or purchase a home or structure with those shingles.

193.     As a result of GAF's untrue, deceptive, and misleading assertions and representations practices relating to Timberline shingles, Plaintiff and putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, not safe for their intended use, and not in compliance with code requirements.

194.     As a result of GAF's untrue, deceptive, and misleading assertions and representations about Timberline shingles, Plaintiff and putative class will suffer damages that include not only the full cost to replace their Timberline shingles, but also include, without limitation, property damage, consequential and incidental damages.

195.     That as a direct, proximate and foreseeable result of GAF's violation of statute, the Plaintiff and putative class members sustained damages in an amount to be determined at trial.

196.     Plaintiffs seek to enjoin GAF from making untrue, deceptive, and misleading assertions and representations about the Timberline shingles or the scope of their warranties.

### Count IX

### (Declaratory and Injunctive Relief)

197.     Plaintiff and the putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

198.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the equitable

power of this Court, and any applicable statute or rule providing for declaratory and / or

injunctive relief, Plaintiff and the putative class members seek a declaratory judgment as follows:

a.     To the extent GAF alleges that any pretend limitations, restrictions or
disclaimers of express warranty preclude full recovery of damages, the
warranties fail of their essential purpose because the remaining remedies
provided therein are inadequate and deprive the class of the benefit of the
bargain of their purchases, because GAF at the time of sale and thereafter
concealed and suppressed that the Timberline shingles were defective, and
because the provisions are otherwise unconscionable;

b.     To the extent GAF alleges that any pretend limitations, restrictions or
disclaimers of express warranty preclude full recovery of damages, the
same is unconscionable because the warranties do not provide adequate
remedies because the defect in the shingles is latent and because the class
members lacked sufficient bargaining power;

c.     That GAF's attempted disclaimers of warranties or limitations of remedies
are ineffective because GAF failed to deliver them to the consumer or
their representatives at the time of sale of the Timberline shingles;

d.     That GAF's attempts to condition express warranty payments on demands
made to consumers that were never part of an express warranty are
unlawful and must be stopped;

e.     That GAF be forced to advise prior warranty claimants that its attempts to
condition express warranty payments on demands made to consumers that
were never part of an express warranty were unlawful;

f.     That the Timberline shingles are unsuitable for their intended use because
they do not comply with ASTM D3462;

g.     That the Timberline shingles need to be replaced because they do not
comply with ASTM D3462; and

h.     To the extent GAF has had an adverse adjudication against it arising from
the subject matter of this Complaint, that the putative class may use
offensive collateral estoppel against GAF for the rulings and
determinations therein.

## Count X

### (Fraudulent Concealment / Equitable Tolling)

199.     Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

200.     The substandard and non-conforming nature of GAF Timberline shingles is not perceptible to a reasonable consumer.

201.     By knowingly selling shingles that it knew would not last the 40-year warranted life and that it knew did not comply with ASTM D3462 at the time of sale and installation but nonetheless labeling the shingles as complying with that standard, thereby making them suitable for use in homes and other structures, GAF affirmatively concealed Plaintiff's causes of action and the claims of the members of the putative class.

202.     GAF's mislabeling of the Timberline shingles was an affirmative act that was intended to prevent, and did in fact prevent Plaintiff and members of the putative class from discovering their potential claims. Because of the nature of concealment and the testing needed to discover non-compliance with ASTM D3462, Plaintiff and members of the putative class could not, even with the exercise of due diligence, have independently discovered their cause of action.

203.     To this day, GAF has continued this concealment and suppression by failing to inform the public about the unsuitability of its Timberline shingles, the creation of its "cracking teams," its conclusion that it had been using substandard materials, and other deficiencies described herein.

204.     Based on this conduct and the allegations herein, GAF is estopped from relying on any statute of limitations or other time-related defense in this action. GAF affirmatively

misrepresented and actively concealed the true nature, character, and quality of the Timberline shingles and, for the reasons described herein, was under a continuous duty to disclose to Plaintiff and the putative class the facts it omitted and concealed. Plaintiff and the members of the putative class reasonably relied upon GAF's misrepresentations and active concealment in not sooner bringing the claims asserted herein.

205.   As a result of GAF's fraudulent concealment, equity requires that the statute of limitations on Plaintiff's and the putative class members' claims to be tolled.

### Prayer for Relief

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief against GAF as follows:

1.   Certification of this matter as a class action and appointing Plaintiff and her counsel to represent the class;

2.   Compensation for damages suffered by Plaintiff and the putative class members;

3.   Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.   Award of additional damages, remedies and penalties available by law;

5.   Requiring GAF to initiate a post-sale instruction and warning campaign, to conduct further testing, and to refrain from making unlawful representations about warranty claims;

6.   Declaring the rights and obligations of the parties as prayed for; and

7.   Such other and further relief the Court deems just and equitable.

Dated: June 2, 2011.

LARSON · KING, LLP

Shawn M. Raiter (240424)
2800 Wells Fargo Place
30 East 7th Street
St. Paul, MN 55101
Telephone:    (651)312-6500
Email: sraiter@larsonking.com

Christopher L. Coffin
**PENDLEY, BAUDIN & COFFIN, L.L.P**
24110 Eden Street
Plaquemine, LA 70765
Telephone:    (225) 687-6396
Email: ccoffin@pbclawfirm.com

Charles J. LaDuca
**CUNEO GILBERT & LADUCA, LLP**
507 C Street, N.E.
Washington, DC 20002
Telephone:    (202) 789-3960
Email: CharlesL@cuneolaw.com

Robert K. Shelquist #21310X
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401-2197
Telephone:    (612) 339-6900
Email: rshelquist@locklaw.com

Michael A. McShane
**AUDET & PARTNERS, LLP**
221 Main Street, Suite 1460
San Francisco, CA 94105-1906
Telephone:    (415) 568-2555
Email: MMcShane@audetlaw.com

**Attorneys for Plaintiff Diane Haner and the
Putative Class**

Lk1310836